COMMONWEALTH *vs.* DENNIS HARDY.

Hampden. January 5, 1998. - February 23, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Mental Impairment. Homicide. Practice, Criminal,* Assistance of counsel, Capital case.

Statement of the standard of review in a capital case, pursuant to G. L. c. 278, § 33E, of a defendant's claim of ineffective assistance of trial counsel. [729-730]

A defendant convicted of murder in the first degree by reason of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, did not demonstrate that the alleged ineffective assistance of his trial counsel in failing to introduce evidence of the defendant's alleged mental impairment likely affected the jury's conclusion that the defendant had the intent required to sustain a conviction of murder in the first degree under all three theories. [729-731]

A defendant convicted of murder in the first degree failed to demonstrate ineffective assistance in his trial counsel's alleged failure to thoroughly investigate the defendant's alleged mental impairment, where the record demonstrated that trial counsel considered the defendant's psychiatric condition and had appropriately concluded that there was a lack of evidence to present such a defense. [731-733]

No reason appeared on the record of a murder trial for this court to exercise its authority under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. [733]

INDICTMENTS found and returned in the Superior Court Department, six on November 8, 1993, and two on November 30, 1998.

The cases were tried before *Francis X. Spina*, J.

A motion for a new trial, filed in this court on July 5, 1996, was considered by *Wilkins*, J., in the Supreme Judicial Court for the county of Suffolk and, after the motion was remanded by him to the Superior Court Department for determination, the motion was heard by *Spina*, J.

*Stewart T. Graham, Jr.*, for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On September 16, 1994, a Hampden County jury convicted the defendant, Dennis Hardy, of murder in the first degree by reason of deliberate premeditation, extreme atrocity or cruelty, and felony-murder.[1] The defendant filed a timely notice of appeal, and also appeals from the denial of his motion for a new trial.[2] The defendant argues that his lawyer rendered ineffective assistance of counsel by not thoroughly investigating and presenting a "diminished capacity" defense at trial. On review of the record of the case, we conclude that there was no error that would require us to grant the defendant a new trial. We also decline to exercise our extraordinary power under G. L. c. 278, § 33E, to revise the murder conviction. We affirm the conviction.

1. The jury could have found the following facts. On the evening of October 31, 1993, the defendant and several others, including Fred Shinholster,[3] met and, after discussing various criminal ventures, agreed on a plan to rob brothers Ron and Oliver Edwards. The group decided to use guns to force their intended victims to hand over money and drugs, and to divide the spoils among themselves.

The group was unsuccessful in locating Ron Edwards. Carrying guns and wearing Halloween costumes to disguise their appearance, the defendant and four others, again including Shinholster, then proceeded to the house of Eric Williams, through whom Oliver Edwards sold drugs. Williams paged Edwards when the group told Williams they wanted to purchase cocaine. When Edwards arrived at the home of Williams to deliver the cocaine, the defendant and one other robbed him. The defendant and his accomplices then walked Edwards and Williams back to Edwards's house at gunpoint in order to force Edwards to hand over whatever drugs and money were there.

Inside Edwards's house, the defendant, holding a semiauto-

---

[1]The defendant was also found guilty of two indictments charging assault and battery with a dangerous weapon, two indictments charging assault with intent to murder, one indictment charging illegal possession of a firearm, and two indictments charging kidnapping.

[2]The defendant filed his motion for a new trial in this court on July 5, 1996. A single justice remanded the defendant's motion to the Superior Court for consideration and determination. After an evidentiary hearing, the Superior Court judge, who was also the trial judge, denied the motion, and issued written findings and rulings supporting his order.

[3]Fred Shinholster, one of the joint venturers, testified on behalf of the Commonwealth.

matic gun, forced Williams into a closet, and demanded that Edwards and his friend, June Johnson, who had been sitting in the living room when they arrived, reveal the location of any drugs in the house. Edwards at first denied that there were any such drugs, but then told the defendant there were drugs in the basement. The defendant forced Edwards to the basement, and there shot him in the back with the semiautomatic weapon. The defendant returned upstairs, where Johnson had remained with one of the accomplices pointing a gun at her. Johnson pleaded with the defendant not to shoot her, telling him that she was pregnant, whereupon the defendant shot her in the stomach. The defendant returned to the basement, where he ordered one of the accomplices to shoot Edwards. As Edwards lay screaming on the floor, the defendant then put his gun to Edwards's head and shot him. Edwards died of multiple gunshot wounds.

The defendant returned upstairs and opened the closet where he had imprisoned Williams. Saying, "It's time for you to die," the defendant shot Williams in the face. Williams pretended to be dead and the defendant closed the closet door. Another bullet was then fired through the closet door and into Williams's back. The defendant returned to Johnson, who was trying to call the police, and shot her in the mouth, both arms, and the leg. Both Johnson and Williams survived. Later that evening the defendant told Shinholster that when he was standing over Edwards, all the defendant could think of was "how Oliver wouldn't sell him no cocaine because of his 'rep' "; the defendant then stated that he had shot Edwards.

2. A competency hearing was held on the day before trial. The Commonwealth's expert, Dr. Wesley Profit, opined that the defendant was competent to stand trial. He testified that shortly after the defendant was admitted to Bridgewater State Hospital, he had concluded, tentatively, that the defendant was not competent to stand trial. During a two-hour interview, the defendant did not answer basic demographic questions, such as his name and date of birth, did not seem to comprehend the nature of the questions he was asked, and appeared to be "profoundly retarded." Dr. Profit said he was unable to identify the origin of the defendant's behavior, and determined at that time that further diagnostic study was called for.

Dr. Profit thereafter learned that the behavior exhibited to him was inconsistent with the defendant's response in a prior interview with a psychologist for the Hampden Division of the

Juvenile Court Department shortly before the defendant was arrested for murder. In that interview the defendant had participated in the examination and had been able to respond to questions. In addition, Dr. Profit learned that the defendant had engaged in "ordinary" conversations with others at Bridgewater State Hospital, and did not interact in a way that was consistent with Dr. Profit's observation of him.[4]

The defendant was then examined by a neurologist at Massachusetts General Hospital, who found "no evidence of pathology or neurological impairment." In addition, a magnetic resonance imaging test disclosed "no organic impairment whatsoever." Dr. Profit then interviewed the defendant again, and observed the defendant in the dining hall and treatment unit at Bridgewater State Hospital. It was his view that outside the interview setting, the defendant had no difficulty interacting with his peers and showed no indicia of psychosis. Dr. Profit ultimately concluded that the defendant was able to cooperate in a formal interview, but was unwilling to do so. Although the defendant was observed by another doctor who said that the defendant appeared to be "severely neurologically impaired," Dr. Profit concluded that the defendant was a malingerer, and that there was no evidence that he was suffering from any kind of major mental illness or psychosis.

The Commonwealth also called to testify a Springfield detective who described the defendant's behavior at the time of his arrest, and a police officer who had observed the defendant's behavior in Springfield over the prior six years and who previously had arrested the defendant three times. Both testified about the normal responsiveness of the defendant when questioned by them, including at the time of his booking following the murder. They testified that the defendant had no difficulty understanding questions or communicating his views to them.

At the competency hearing the defendant's expert witness, Dr. Ronald Ebert, opined that the defendant was not competent to stand trial. The defendant had been as uncommunicative during an interview with Dr. Ebert as he had been with Dr. Profit. Dr. Ebert was unable, however, to exclude the possibility that

---

[4]The judge found that the defendant presented himself to Dr. Profit as "virtually catatonic" in contrast to his behavior outside the interview where "he mingled freely with other inmates and was even gregarious." Those findings are supported in the record.

the defendant was malingering. The judge ruled that the defendant was competent to stand trial.

Dr. Ebert again testified at the hearing on the motion for a new trial. In support of his motion, the defendant also submitted an affidavit from his mother that described his troubled childhood. According to his mother's affidavit, she had consumed cocaine and other drugs during her pregnancy and, in her view, the defendant was born "addicted to cocaine." She described his physically abusive conduct to himself and other family members, his transfer to "special education" classes at school, and the fact that he had not attended school beyond the eighth grade and had begun using drugs when he left school. At this hearing Dr. Ebert again testified that, based on the two occasions that he had seen the defendant, he was unable to conclude whether the defendant was malingering. He agreed that from his perspective this case was unusual in that respect. Dr. Ebert said that he had reviewed the mother's affidavit and one from the defendant's grandmother, that he had not received any "objective information about the matters addressed," and that the information he had was "limited." He testified that the defendant's mental functioning "could" have affected his ability to form the specific intent to commit "any crime."

3. Relying on *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), the defendant argues that evidence of his "diminished capacity"[5] should have been introduced at trial by his counsel and would have supported a claim that he did not have the necessary mens rea required to sustain a conviction of murder in the first degree. His counsel's failure to do so, he argues, left him with no defense at all to the crimes charged. Our standard of review under G. L. c. 278, § 33E, of a defendant's conviction of murder in the first degree is "more favorable to a

---

[5]There is no "diminished capacity" defense in this Commonwealth. *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995). In *Commonwealth* v. *Gould*, 380 Mass. 672, 673 (1980), we said that a defendant "may produce expert testimony on the issue whether or not the impairment of his mental processes precluded him from being able to deliberately premeditate," and whether the defendant acted with extreme atrocity or cruelty. We have also said that evidence of a defendant's mental impairment is relevant to the question "whether the crime of murder was committed at all," *Commonwealth* v. *Grey*, 399 Mass. 469, 470 (1987), including issues of intent and knowledge, *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992), and whether a murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Baldwin*, *ante* 105 (1997).

defendant than is the constitutional standard for determining the ineffectiveness of counsel." *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). We therefore review a defendant's claim by determining "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* at 682. Under this more favorable standard of review, we consider a defendant's claim "even if the alleged error on the part of trial counsel does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 517 (1992).

The defendant argues in the main that his trial counsel should have sought to introduce through the expert testimony of Dr. Ebert evidence of the defendant's mental impairment. He also argues that his mother and grandmother should have been called by his trial counsel to testify about that subject. We believe, however, that testimony about the defendant's mental impairment would not likely have affected the jury's conclusion that at the time of the murder he had the mens rea necessary for a conviction of murder in the first degree. *Commonwealth* v. *Robbins,* 422 Mass. 305, 309 (1996). *Commonwealth* v. *Parker,* 420 Mass. 242, 247 (1995). There was overwhelming evidence that the defendant had planned both the robbery and the events leading to the murder.[6] There was also compelling testimony that the defendant formulated the intention to kill Edwards and that he carried out that intention, knowing well the consequence of his actions; there was testimony that the defendant had shot the victim once, then returned to the basement and ordered his accomplices to shoot the victim a second time. The defendant then stood over the victim and shot him in the head at point blank range. Some hours after the killing, the defendant was able to recount to one of his accomplices exactly what had hap-

---

[6]Trial counsel testified at the motion for a new trial that "there was quite a bit of thought that went into the pre-planning and the information that I had was that [the defendant] was one of the main planners." His testimony is supported by the evidence at trial. Trial counsel further testified that in the face of the eyewitness testimony of a joint venturer, and of the two victims who survived the assault, he hoped to persuade the jury that the defendant was not the ringleader, and that he did not intend the particular activities that transpired after the joint venturers returned to the house of Edwards. Although appellate counsel characterizes this approach as no defense at all, we believe the strategy in all likelihood was the only one available.

pened and his thought processes as it happened, all indicative of his clarity of mind. See *Commonwealth* v. *Millyan*, 399 Mass. 171, 179-180 (1987). In short, the evidence revealed "deliberation, resolution, and action." *Commonwealth* v. *Parker*, 420 Mass. 242, 248 (1995), quoting *Commonwealth* v. *Parker*, 412 Mass. 353, 360 (1992). See *Commonwealth* v. *Bousquet*, 407 Mass. 854, 863-864 (1990) (in face of overwhelming evidence that defendant was capable of possessing requisite intent, decision not to call expert witness on the issue of mental impairment did not constitute ineffective assistance of counsel).

As to extreme atrocity or cruelty, the evidence with respect to each separate victim (Edwards, who was murdered, and Williams and Johnson, who were brutally assaulted but who survived) made apparent the defendant's plain indifference to each victim's pain, and established the savagery and brutality of the attacks. On the conviction on the felony-murder theory, the defendant's alleged diminished capacity was relevant only to the question of whether the defendant had the specific intent to steal. See *Commonwealth* v. *Tevenal*, 401 Mass. 225, 230 (1987). There was overwhelming evidence that the defendant, as part of a joint venture, and as one of the initiators of the scheme, intended to steal the victim's drugs while masked and armed.

The defendant makes a specific claim that counsel was ineffective in failing to investigate the full extent of his mental impairment. We conclude, as did the motion judge denying the defendant's motion for a new trial, that there was no error in this respect either. The record demonstrates that counsel did consider the defendant's psychiatric condition and concluded, appropriately we believe, that there was a lack of evidence to present such a defense.[7] See *Commonwealth* v. *Finstein*, *ante* 200, 204 (1997) (strategic choices reasonably made by counsel may not be challenged on ground that counsel was ineffective). The motion judge found that the defense counsel had "followed through on the leads from defendant's grandmother about defendant's birth addiction to cocaine, and learned that the

---

[7] The motion judge also found that had trial counsel introduced such a defense, the Commonwealth would have been able to introduce rebuttal evidence that would be severely damaging to the defendant. On appeal, defendant's new counsel argues persuasively that the evidence that the defendant had alleged "leadership" skills was slight, and that additional damaging information would not have been admissible. We do not reach our conclusion on that basis.

hospital records indicated otherwise."[8] He also found that the defendant's "ability to feign [mental illness] was exquisite." Both findings are fully supported. In addition, counsel sought approval for, and retained, an expert for the defense, Dr. Ebert.[9] Even he was unable to rule out the possibility that the defendant was malingering.[10] When informed that the defendant had responded to questions on other occasions in a rational and coherent way, Dr. Ebert agreed that this behavior would be inconsistent with his own observations and could be evidence of malingering. The defendant's criminal responsibility was not the "most substantial issue" in this case, and there is considerable doubt that the defendant "was a man in the grips" of some psychotic episode. Cf. *Commonwealth* v. *Robbins*, 422 Mass. 305, 307 (1996).

At the hearing on the motion for a new trial, trial counsel also testified that he did consider calling an expert witness on the issue of "diminished capacity," but in light of the testimony at the competency hearing by experts for both the Commonwealth and the defense, it was his judgment that this was not a viable defense. Certainly, Dr. Ebert's opinion at both the competency hearing and the hearing on the motion for a new trial that the defendant was incompetent and was not malingering was equivocal at best. The suggestion of the defendant's mother that the defendant had been addicted to cocaine at birth, and her statements that he had been unruly and sometimes violent as a child were also properly rejected by the judge as evidence on the defendant's mental impairment. In any event,

---

[8]On appeal, the defendant makes much of his trial counsel's failure to obtain the written records of his birth from a hospital in Mississippi. We accept, as did the judge, that when he contacted the hospital by telephone, trial counsel received information of a nature that indicated that further investigation would not be helpful. We observe that, in connection with the motion for a new trial, the defendant's mother made the same claim of his addiction to cocaine at birth, but that hospital records of his birth were not offered in evidence by counsel.

[9]The defendant draws a distinction between trial counsel's request that Dr. Ebert evaluate the defendant for purposes of his competency to stand trial, in contrast to evaluating his "diminished capacity" and whether he had the capacity to deliberately premeditate his actions. Dr. Ebert testified, however, that the defendant "had a mental illness that *might* rise to the level of lack of criminal responsibility or diminished capacity," as the judge correctly found.

[10]At the competency hearing, Dr. Ebert testified that he "couldn't tell whether [the defendant] was psychotic or whether he was malingering." He gave similar equivocal testimony at the hearing on the motion for a new trial.

the claim of addiction could not be substantiated by trial counsel.

While the defendant claims that the strategy employed by defense counsel was not effective given the nature of the charges against the defendant, "the basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 111 (1977).

4. We have reviewed the entire record consistent with our statutory obligation under G. L. c. 278, § 33E, and conclude that there is no reason to reduce the verdict or to order a new trial. The evidence against the defendant was overwhelming.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*