## COMMONWEALTH *vs.* BRIAN J. GABORIAULT.

Bristol. January 10, 2003. - March 31, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Admissions and confessions, Appeal, Findings by judge, Voluntariness of confession, Assistance of counsel, Competency to stand trial, Medication of defendant during trial, Capital case. *Evidence,* Admissions and confessions, Sanity, Expert opinion. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Waiver. Mental Impairment. Insanity. Homicide. Malice.*

A police officer's three recitations of Miranda warnings to the defendant in a murder case were not, in the circumstances, rendered inadequate by the officer's description of them as a "formality"; nor did the record at trial support the defendant's contention that an alleged past relationship with the officer, when coupled with the "formality" statement, created a highly coercive environment that eviscerated the voluntariness of the confession; consequently, the judge at the defendant's trial for murder in the first degree did not err in denying the defendant's motion to suppress his statement to police. [87-89]

At the trial of indictments for murder in the first degree, defense counsel's tactical decisions in withdrawing the issue of criminal responsibility from the jury's consideration [90-93], failing to pursue a sleep deprivation defense [93-94], failing to examine one of his own expert witnesses concerning the expert's opinion of the criminal responsibility of the defendant [94-95], and failing to secure, and to appraise the defendant of, his right to appear at trial in an unmedicated state [95-96] were not manifestly unreasonable.

INDICTMENTS found and returned in the Superior Court Department on August 22, 1996.

The cases were tried before *Raymond J. Brassard,* J., and a motion for a new trial, filed on September 11, 2000, was heard by him.

*David P. Hoose* for the defendant.

*Sharon L. Sullivan-Puccini,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant, Brian J. Gaboriault, was tried

before a jury on two indictments charging murder in the first degree. He was found guilty based on theories of deliberate premeditation and extreme cruelty or atrocity. He appeals from his convictions and the denial of his motion for a new trial, asserting several claims of error. First, the defendant claims that the Miranda warnings he received prior to his confession were defective and his waiver was not knowing, intelligent, or voluntary. Thus the defendant claims the trial judge erred in denying the motion to suppress his statement to police. Second, the defendant claims that his trial counsel was ineffective in (1) withdrawing the issue of criminal responsibility from the jury's consideration; (2) failing to retain a sleep deprivation expert; (3) failing adequately to examine one of his own expert witnesses concerning the expert's opinion of the criminal responsibility of the defendant and; (4) failing to secure, and to apprise the defendant of, his right to appear at trial in an unmedicated state. Finally, the defendant also requests that we exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or reduce the defendant's degree of guilt. Because we find no merit to the defendant's claims of error and no substantial likelihood of a miscarriage of justice, we decline to exercise our § 33E power. We affirm the defendant's convictions and the order denying his motion for a new trial.

A. *Facts.*

We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. The facts of the defendant's brutal murders of eighteen year old Jennifer Pike (victim) and their infant son are largely undisputed. At the time of the murder, the defendant resided with the victims and his mother in an apartment in Fairhaven. The victim had begun dating the defendant two years earlier and had been living with the defendant for about one year. Their relationship was marked by the defendant's possessive and controlling behavior, and culminated in the victims' leaving the apartment in the days preceding the murders.

On July 6, 1996, while the defendant was at work, the victim took their baby and moved out of the apartment. The move was precipitated by increasingly disturbing behavior and threats by

the defendant.[1] When the defendant heard that the victim had moved out, he became extremely agitated, asked friends to help look for her, and eventually arrived unannounced at the victim's sister's house looking for her. At some point, one friend heard him say that if the victim left him, he would "kill them all." On July 8, after arriving at the victim's parent's home and having dinner, the defendant talked to the victim about "getting back together." He promised her that he would receive counselling for his anger problems, and even had made an appointment for the next day.

Around 9 P.M., the defendant, his mother, and the victims returned to the apartment. Shortly thereafter, the victim told the defendant that, "[f]or the short time they were apart she felt like she was out of prison." Prior to returning home, the defendant had taken a large knife, wrapped it in a shirt, and placed it underneath a chair. During his confession to police, he explained that it was his plan "to take their lives" once they returned to the house.

While his mother was outside talking with a neighbor, the defendant began to stab the victim viciously. His mother heard the victim's screams, rushed in to find her being stabbed, and heard her say, "I'm dying. You're killing me." The defendant's mother proceeded to run out of the apartment and yell for someone to dial 911. After stabbing the victim seventeen times, the defendant left the room, and approached his baby lying on a bed in another room. He proceeded to stab the eight week old infant twice, the second time with such force that the knife remained lodged in the infant, impaling him to the bed.[2] It later took four officers to remove the dying infant from the bed, as the knife was firmly lodged in the mattress.

After removing his socks so as not to leave a bloody trail, the

---

[1] In November or December of 1995, the defendant hit the then-pregnant victim across the face during an argument. In June of 1996, he told her that if she left, he would kill her. Two weeks before the murders, the victim telephoned a friend and asked for a ride. The defendant grabbed the telephone and told the friend that if she came over to give the victim a ride, he would "fuck [her] up." Later, he told the same young woman that sometimes he felt like killing the victim. Finally, on July 5, the defendant became angry when the victim wore a bikini.

[2] The defendant later confessed that he stabbed the baby because he did not want him to grow up in foster care without his parents.

defendant fled the apartment. He next stopped at a friend's house and had a glass of juice with his friend's father, and eventually found his way to the cemetery where his own father was buried.[3] Police found him there on the morning of July 9. He received Miranda warnings from the officer who found him, Lieutenant Donald Joseph, who then contacted an officer known to the defendant, Detective Glenn Souza.[4] During the ride to the station, the defendant indicated he wished to give a statement regarding the murders, but Detective Souza said to wait until they arrived at headquarters. On arrival, he was again given Miranda warnings. Immediately before, however, Detective Souza referred to the Miranda warnings as "just a formality." The defendant signed the Miranda form, stated that he understood his rights, and was willing to speak. However, the video camera in the interrogation room was not functioning properly and the interrogation was moved to another room, where the defendant was once again advised of his rights immediately before giving his full statement. In all, the defendant received his Miranda warnings three times prior to the videotaped confession in which he admitted to stabbing the victims.

B. *Discussion.*

1. *Miranda warnings.* The defendant first claims that the Miranda warnings were rendered inadequate by Detective Souza's description of them as a "formality." He claims that this word undercut the purpose of the rights, and relegated them to a mere preliminary ritual, devoid of substance or meaning. Additionally, the defendant claims that the word "formality" rendered the subsequent recitation in the second interrogation room invalid as well, as it created a notion in the defendant's mind that the rights were void of significance. We disagree.

In reviewing a judge's determination regarding a valid waiver of Miranda rights and voluntariness, we "accept[] the judge's

---

[3]According to the defendant, he made his way to the roof of a building that would allow him access to a radio tower. His plan was to climb the tower and then jump off. He could not, however, bring himself to do it.

[4]At the hearing on the defendant's motion to suppress, Detective Souza testified that he had questioned and arrested the defendant on previous occasions, and that the defendant had indicated to Lieutenant Joseph that he would feel more comfortable speaking with Detective Souza, given their past contact.

subsidiary findings of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 751 (2002), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). Additionally, in *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000), we held that the "history of art. 12 [of the Massachusetts Declaration of Rights] and our prior interpretations of its self-incrimination provisions . . . lead to the conclusion that art. 12 provides greater protection than the Federal Constitution does." *Id.* at 859.

The judge found that immediately prior to the second recitation of the Miranda warnings to the defendant, Detective Souza indicated that the rights were a "formality."[5] The circumstances surrounding this interrogation, taken as a whole, demonstrate that the use of the word "formality" did not render the Miranda warnings constitutionally inadequate. The defendant was read his Miranda warnings three times, and after all three readings, indicated a willingness to speak with the officers. The defendant also signed a Miranda card acknowledging the rights he was given, and prior to his statement never asked for an attorney or whether he could make a telephone call. Additionally, he was given more time to reflect on his waiver because of the malfunctioning video equipment in the first interrogation room. When he was brought to the second room, and read his Miranda warnings for the third time, he once again waived them. Although any use of words that characterize or minimize a suspect's Miranda rights should be avoided, we agree that in this situation, using the word "formality" did not coerce or mislead the defendant as to the rights he was waiving.[6] We therefore find no reversible error.

Additionally, and closely related to the preceding claim of er-

---

[5]In making this finding, the judge relied on a videotape of the booking procedure that came to light just before trial. In making the rest of his findings, the judge heard testimony from Detective Souza and other officers, and scrutinized the videotape of the interrogation.

[6]The defendant previously had been arrested by Detective Souza, thus further indicating his knowledge of the Miranda warnings from at least one other occasion. See note 4, *supra.*

ror, the defendant also contends that the entire Miranda procedure, when taken as a whole, rendered his waiver invalid. The defendant's waiver of his Miranda rights must be voluntary, knowing, and intelligent beyond a reasonable doubt. See *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996), quoting *Commonwealth* v. *Edwards*, 420 Mass. 666, 669 (1995) (Commonwealth has burden of proving validity of Miranda waiver beyond reasonable doubt). See also *Commonwealth* v. *Rodriguez*, 425 Mass 361, 366 (1997), and cases cited (court must examine totality of circumstances surrounding voluntariness of Miranda waiver). The judge's findings on voluntariness are entitled to substantial deference. See *Commonwealth* v. *Brum*, 438 Mass. 103, 113 (2002); *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000).

While making extremely thorough and well-reasoned findings, the judge carefully considered the totality of the evidence and concluded the defendant's waiver was voluntary, knowing, and intelligent. Based on the videotape recording of the defendant before, during, and after his statement, and also on witness testimony, the judge found that the defendant was coherent and not under the influence of any drug or alcohol. The judge also found that the defendant was given his Miranda warnings three times, that there was no evidence of coercion or trickery on behalf of the officers, and finally, that there was no evidence of inappropriate or inordinate psychological pressure. Additionally, the judge found that although the defendant had a somewhat below average intelligence,[7] he maintained employment and a home. The record does not support the defendant's contention that his "past relationship" with Detective Souza,[8] when coupled with the "formality" statement, created a highly coercive environment that eviscerated the voluntariness of the confession. As a result, we decline to disturb the judge's ruling to admit the defendant's statement to the police.

---

[7]Neuropsychological testing by the defense expert demonstrated that the defendant's I.Q. fell in the low average range, while on previous occasions the defendant had tested in the average range. On cross-examination, the defense expert conceded that depression could decrease an individual's I.Q score on the standardized test.

[8]There is no substantial evidence presented that the defendant and Detective Souza had any relationship other than that of a police officer and suspect.

2. *Ineffective assistance of counsel.* This court is granted substantial power under G. L. c. 278, § 33E, to review an appeal from a conviction of murder in the first degree. In evaluating a defendant's claim of ineffective assistance of counsel in a capital case, we consider whether there was error at trial and, if so, whether that error was likely to have influenced the jury's conclusion. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992). See also *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002) ("In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we begin by determining whether there was a serious failure by trial counsel. If so, then we determine whether the failure resulted in a substantial likelihood of a miscarriage of justice"). This standard is more favorable to defendants than the constitutional standard. See *Commonwealth* v. *Wright, supra* at 682 ("substantial likelihood" standard of § 33E more favorable to defendant). We will, however, give trial counsel's tactical decisions due deference. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 354 (2001), and cases cited. We have previously held that "[a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

a. *Withdrawal of a defense of lack of criminal responsibility.* The defendant now claims, in essence, that he was denied a meaningful defense because trial counsel abandoned a *McHoul* defense. *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).[9] In his opening statement, trial counsel conceded that the defendant killed the victims,[10] but indicated that he was not criminally responsible.[11] Trial counsel presented two expert witnesses in order to show that the defendant either was not responsible for

---

[9]*Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), states that in order to constitute a defense, the defendant must have had a mental disease or defect that deprived him of the substantial capacity to appreciate the criminality of his actions or conform his conduct to the requirements of law.

[10]Trial counsel had no choice. In addition to the confession, there would be undeniable evidence presented that the defendant killed the victims; his own mother was going to testify that she walked into the room and saw the defendant stabbing the defenseless victim.

[11]The defendant suggests that, because trial counsel knew prior to trial that his expert witness would not be able to render testimony concerning lack of

his actions or suffered from a diminished capacity at the time of the murders. The first witness, Dr. Chet Lesniak, was hired primarily to conduct a battery of neuropsychological tests on the defendant and to report the results to the other expert witness, Dr. Marc Whaley. Dr. Whaley was hired as the primary defense expert witness to use Dr. Lesniak's results to form an opinion whether the defendant was criminally responsible for the murders. Unfortunately for the defendant, his own expert witness opined that, although Dr. Lesniak's tests indicated a possible organic brain disorder, the defendant was not completely lacking in criminal responsibility.

Once it was determined by the defendant's own witness that he would not meet the two-pronged *McHoul* test, an alternative strategy for counsel was to pursue a claim of diminished capacity. Trial counsel attempted to show that the defendant had a diminished mental capacity at the time he stabbed the victims, thereby "render[ing] him unable either to form the specific intent to kill or to premeditate." *Commonwealth* v. *Laurore*, 437 Mass. 65, 70 (2002). See *Commonwealth* v. *Gould*, 380 Mass. 672, 683 (1980). While there is no diminished capacity defense in Massachusetts, the *Gould* case stands for the proposition that the defense may produce psychiatric evidence that would allow a jury to consider whether the defendant lacked the mental capacity to premeditate the killing. *Id.* See *Commonwealth* v. *Hardy*, 426 Mass. 725, 730 (1998); *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995) (there is no "diminished capacity" defense in Commonwealth); *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.2 (1987).

Moreover, malice is a necessary element of both murder in the first and second degrees, and "[m]alice is established by proof beyond a reasonable doubt that the defendant specifically intended either to kill the alleged victim or to cause grievous bodily harm." *Commonwealth* v. *Azar*, 435 Mass. 675, 681-682 (2002). Malice may also be inferred "if, in the circumstances known to the defendant, a reasonably prudent person would

criminal responsibility, it was improper to allude to such a claim during his opening argument. The opening statement was proper, as sufficient evidence was presented by lay and expert witnesses regarding the defendant's sanity and ability to premeditate to warrant counsel's tactical decision.

have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Id.* at 682, quoting *Commonwealth* v. *Grey, supra* at 470 n.1. These are commonly referred to as the three prongs of malice. See, e.g., *Commonwealth* v. *Sirois*, 437 Mass. 845, 858 (2002). Only the first prong of malice, specific intent to kill, may satisfy murder in the first degree by deliberate premeditation. *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001). *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995). While the first two prongs of malice have a specific intent requirement that may be negated by mental impairment, the third prong has a knowledge requirement that may also be negated by a defendant's mental impairment. See *Commonwealth* v. *Hardy*, 426 Mass. 725, 730 (1998), citing *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992) (evidence of intent and knowledge relevant to whether murder was committed at all).[12]

---

[12]In his brief, the defendant claims that trial counsel's diminished capacity strategy provided no defense to murder in the second degree. Because the jury convicted him of murder in the first degree by both premeditation and extreme cruelty and atrocity, the merit of this argument is largely irrelevant, as the jury's finding of premeditated murder in the first degree demonstrates that they believed that the defendant had the specific intent to kill. This court has previously stated, however, that a defendant's mental impairment is relevant to intent *and* knowledge. See *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992); *Commonwealth* v. *Sama*, 411 Mass. 293, 297-298 (1991) (evidence of intoxication bears on knowledge requirement of third prong of malice). Thus trial counsel's strategy to focus on the defendant's mental impairment did not concede his guilt of murder in the second degree.

Under G. L. c. 278, § 33E, we review the entire record, and it is appropriate to mention parts of the judge's jury instructions. The judge did not repeat his proper instruction regarding mental impairment in conjunction with his charge on murder in the second degree and merely summarized the elements of the three prongs of malice. There was no substantial likelihood of a miscarriage of justice, especially where the jury convicted the defendant of murder in the first degree. Finally, the judge instructed the jury on the first two prongs of malice during his charge on deliberate premeditation. This is error, as only a finding of the first prong of malice may warrant a return of premeditated murder in the first degree. *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001). We have consistently held, however, that this error may be cured by a proper instruction on premeditation "insofar as it emphasized that the jury must specifically find an 'intent to kill' in order for them to convict." *Commonwealth* v. *LaCava*, 438 Mass. 708, 717 n.9 (2003). The judge did in fact instruct the jury regarding premeditation, that the defendant must have made a

Trial counsel was therefore faced with a situation where he had experts that would testify toward a diminished capacity claim, but not lack of responsibility. His tactical decision to focus on diminished capacity was therefore logical and cannot be seen as depriving the defendant of an adequate defense. See, e.g., *Commonwealth* v. *LaCava*, 438 Mass. 708, 716-718 (2003). The judge did instruct the jury on lack of responsibility as outlined by the *McHoul* case, as defense attempted to elicit lay witness testimony regarding the defendant's behavior in the days leading up to the murders. See *Commonwealth* v. *Guadalupe*, 401 Mass. 372 (1987) (expert testimony not required to raise insanity defense). Finally, as the judge found in denying the defendant's motion for a new trial, counsel's closing argument "did not constitute an abandonment of the insanity defense," however he did shift "the emphasis away from that defense, which was supported only by lay witness testimony, to the more promising one of inability to premeditate." Accordingly, we do not second guess this tactical decision of trial counsel, and find no substantial likelihood of a miscarriage of justice.

b. *Failure to retain a sleep deprivation expert.* The defendant now alleges that trial counsel was aware that the defendant had gone without sleep in the days leading up to the crime, and has submitted an affidavit from an expert on sleep disorders (Dr. John Christian Gillin) regarding the potential effects of sleep deprivation on the actions of the defendant. Based solely on information provided by appellate counsel, Dr. Gillin concluded that Dr. Whaley did not adequately consider sleep deprivation and thus rendered his analysis "substandard and unreliable."

Despite the fact that there was testimony from the defendant's mother regarding his lack of sleep preceding the murders, none of the experts retained by trial counsel recognized sleep deprivation as a viable tool that would help the defendant at trial. The judge found that counsel was not ineffective for "failing to recognize the defendant's lack of sleep as a critical issue," when his own experts did not do so. In fact, although it is not

"decision to kill," and have had a "resolution to kill." Therefore, "the erroneous malice instruction . . . raises no substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Daye*, 435 Mass. 463, 478 (2001), and cases cited.

clear whether a sleep deprivation theory was ever discussed
with either Dr. Lesniak or Dr. Whaley, both experts had avail-
able to them the information regarding the defendant's behavior
in the days before the murders. Additionally, the evidence of
sleep deprivation was mainly derived from the defendant's own
statement and his mother's testimony.

There was also evidence available to rebut the claim that the
defendant suffered from sleep deprivation at the time of the
murders. The videotape recording of the interrogation revealed
the defendant was able to recount the killings in detail and
clarity. A friend testified that he and the defendant lifted weights
the morning of the killings and that the defendant appeared to
be behaving normally. The defendant also appeared normal to
the father of another friend immediately after the killings, as he
sat and drank a glass of juice with him.[13] It would therefore be
a reasonable tactical strategy, even in hindsight, not to pursue
this claim given the self-serving nature of the only evidence to
support it. Coupled with his own experts' failure to raise a sleep
deprivation issue, trial counsel was not ineffective for failing to
pursue this defense, and the possibility of such a claim does not
allow us to conclude that a substantial likelihood of a miscar-
riage of justice has resulted.

  c. *Failure to seek an opinion on criminal responsibility from
Dr. Lesniak.* The defendant also alleges that his trial counsel
was ineffective for failing to elicit an expert opinion from Dr.
Lesniak regarding his assessment of the defendant's criminal
responsibility. Dr. Lesniak was hired by the defense on the
advice of Dr. Whaley to assess the defendant's brain function-
ing through the interpretation of neuropsychological testing. Dr.
Whaley was particularly interested in what the tests would
reveal about the defendant's intellectual capacity, capacity to
solve problems, and ability to control impulses. Dr. Whaley
viewed Dr. Lesniak's role as limited, because he was not going
to be provided with all of the information relevant to determine
whether the defendant was criminally responsible at the time of

---

[13]Although none of these facts forecloses the applicability of a sleep expert's
testimony on the effects of sleep deprivation, we must review trial counsel's
decision on the facts available at the time of the trial. Cf. *Commonwealth* v.
*Johnson*, 374 Mass. 453, 465 (1978).

the killings. Dr. Whaley briefly discussed his ultimate findings with Dr. Lesniak, but never asked Dr. Lesniak his opinion on the final determination of criminal responsibility. The judge found that "it would not be common practice to do so." Although Dr. Lesniak was well aware of the nature of the case, he never volunteered any additional information or opinion on whether the defendant was criminally responsible. Dr. Lesniak now offers an affidavit that if he had been asked, he would have opined that the defendant was unable to conform his behavior to the requirements of the law as a result of his organic brain disorder and chronic affective disorder.

At the time of trial, Dr. Lesniak had never conducted a criminal responsibility examination, nor had he testified at a murder trial. We agree with the judge that given the limited scope of Dr. Lesniak's purpose for the defense, and given that Dr. Whaley was the primary defense expert on criminal responsibility, it was not a manifestly unreasonable decision for trial counsel not to review the ultimate finding of criminal responsibility with Dr. Lesniak. Thus, we agree with the motion judge that it is unnecessary to determine whether Dr. Lesniak even would have been qualified to issue such an opinion at trial.

d. *Right to appear at trial in an unmedicated state.*

Finally, the defendant claims that the blunting effect of his "daily pharmacological cocktail" denied him of his right to appear unmedicated in front of the jury. It is well established that the jury may consider the defendant's court room demeanor when the defendant's sanity is at issue at trial. See *Commonwealth* v. *Smiledge*, 419 Mass. 156, 160 (1994); *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983). The rationale is that, if "the defendant appears calm and controlled at trial, the jury may well discount any testimony that the defendant lacked, at the time of the crime, substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *Commonwealth* v. *Louraine, supra* at 34-35. That right, however, is not unrestricted, and should be reviewed on a case-by-case basis. See *Commonwealth* v. *Gurney*, 413 Mass. 97, 103 (1992). In some cases, the defendant's demeanor in an unmedicated state may not be relevant. *Id.*

In this case, the judge found that the defendant was treated for depression and anxiety, with medications that did not have the drastic effect of undermining his defense of lack of criminal responsibility. Furthermore, the defendant requested and voluntarily took the medication to combat depression and sleeplessness.[14] We take into account trial counsel's testimony at the hearing on the motion for a new trial that he never discussed the option of the defendant's appearing unmedicated at trial; we do not find this to be a manifestly unreasonable action by trial counsel.

C. *G. L. c. 278, § 33E, review.*

After a review of the entire record, we conclude the verdicts of murder in the first degree are supported by the evidence. We therefore decline to order a new trial or reduce the defendant's degree of guilt.

*Judgments affirmed.*

*Order denying motion
for a new trial affirmed.*

---

[14]The doctor's instructions were for administration of the medication as needed. The defendant testified at the hearing on the motion for a new trial that the medication was usually brought to him, he never refused it, and if it was not brought to him, he would request it.