Agnes, Peter W., J.
1. The defendant, Carlos Rios, is charged by indictment with the murder of Christopher Olivencia on March 8, 2007. He has filed a pretrial motion to suppress statements he made to Florida police and Massachusetts police on March 14-15, 2007.
2. Findings of fact The record before the court consists of the audio recordings of the two police interviews (exhibits 2 and 3), a signed Miranda waiver form dated March 15, 2007 (exhibit 1), a written report from the Orange County Sheriffs Department to the Worcester Police (exhibit 4), a transcript of the recorded interview between the defendant and the Worcester Police on March 15, 2007 (exhibit 5), Worcester Police “Master Card” detail for the defendant (exhibit 6), and a compilation of Worcester Police Department reports relating to the defendant (exhibit 7). Based on this evidence, I make the following findings of fact. The defendant, Carlos Rios, surrendered himself to the Orange County Sheriffs Department at approximately 9:00 p.m. on March 14, 2007. He told the police he believed there was a warrant for his arrest for the crime of attempted murder. The defendant was placed in custody. The Florida police, Detective Susan Hempsfield and Detective Mark Hussey, verified that there was an arrest warrant outstanding for the defendant, but that it was for the crime of Murder alleged to have been committed in Worcester, Mass, on March 8, 2007. The Florida detectives also contacted the Worcester Police and were briefed on the status of the investigation. The defendant was brought to an interview room. He was not handcuffed. He was told the interview was being recorded. He was informed of his Miranda rights. At one point he indicated he did not understand the Miranda rights. He also remarked that he was unable to afford an attorney and questioned how it was that he could have an attorney. After his rights were read to him, the defendant asked the police “what does that Miranda warning do.” The Miranda rights were read again to the defendant. Thereafter, the defendant signed a Miranda waiver form.
3. The defendant was asked about his drug and alcohol use. He admitted to being a regular marijuana smoker, but said he had not been drinking for several weeks. He told the Florida police he turned himself in because he knew the police were looking for him. He indicated he got to Florida by stealing three cars arid that he walked seven miles to the Sheriffs Office. He told the police he had little memory of the trip to Florida. He said he had been “throwing up” for the past three days over the death of his aunt. He said he had not eaten in eight days. The police did offer him food and candy. He reported he was feeling sick. The defendant provided some biographical details including the fact that he had two young children and a girlfriend who was their mother. At first he denied any knowledge of the victim, but then indicated that the victim had stabbed him three times. Soon after the interview began, the defendant began to cry and at times was sobbing. He also said he was scared of the victim’s family, that they had harmed his girlfriend and would *640 kill him. The defendant said, in a sobbing voice, he wanted to hang himself.
4. The police questioned the defendant’s account of recent events and indicated that they had information from an unidentified eyewitness who was with the defendant that on March 8, 2007 the defendant was in a vehicle which pulled up to 33 Mount Vernon Street in Worcester. The victim was standing in the vicinity. The defendant rushed out of the vehicle and stabbed the victim to death and returned to the car which left the scene. The police also indicated they had corroborating information from his girlfriend. The defendant denied stabbing the victim. The police suggested that it would be a “big deal" to the court if the defendant said it was self-defense. In reply to the defendant’s statement, as he was crying, that if he told the police what happened he would be killed, the police indicated that if the defendant said it was an accident or self-defense, it would be understandable. The police again stated that they had information that it was an unprovoked stabbing. The defendant continued to sob, but admitted he did it and said it was self-defense. According to the defendant, the victim pulled out a knife and the defendant grabbed it and stabbed the victim. Most of the police questions were of the leading variety and most of the defendant’s answers were short with little elaboration. The defendant repeated his statement about wanting to kill himself.
5. At some point during this recorded interview, the police told the defendant that Erika, his girlfriend, told them his story was a lie, and that the defendant had a motive to kill the victim because the victim had fathered one of the defendant’s children with Erika while the defendant was in jail. The police also identified the defendant’s companion at the time of the stabbing who the police said told them he saw the defendant stab the victim. The police indicated that the defendant was facing a charge of murder in the first degree, and “this is your opportunity to tell the truth.” When the defendant claimed he could not recall what had happened, the police added that if the defendant stuck to his story he would be placed in the general population of the jail back in Massachusetts and the police would not be able to protect him from the victim’s friends and family. When the defendant remarked rhetorically he was dead either way whether he lied or told the truth, the police suggested a third alternative—that he describe the stabbing as an accident or self-defense. Shortly thereafter, the defendant described the event as a stabbing in self-defense. The defendant said he could not recall the details of how he arrived in Florida from Massachusetts. The police then asked him if there was anything else he wished to add to the tape “because this may be your only opportunity.”
6. The following day, the defendant was interviewed again by Worcester Police detective Daniel Rosario and the Florida detectives who had interviewed him the day ■
before. When asked if he recalled his Miranda warnings, the defendant replied, in what appears to be a slurred voice, that “they gave me two pills.” The police indicated that they would make inquiry later about the medication given to the defendant, but continue with the interview. Without repeating the Miranda warnings, Detective Rosario inquires about the stabbing asking the defendant “what happened?” Most of the talking is done by the police. The defendant states, in reply to Detective Hempfield’s question about the origin of the knife, that it came from the victim’s hand. Early in the interview the defendant begins to cry and sob again as he did during the interview the day before. About five minutes into the interview, the police summarize the Miranda warnings, and then add “this is really going to help you.”
7. At some point during this interview, the defendant gives an account of the stabbing similar to his self-defense account of the day before with the additional fact that he picked up his “wife” after the event. When he repeated that he had driven himself to Florida, Detective Rosario interjected that the police suspect that uncle Jesus drove the defendant to Florida, that the uncle is facing serious criminal charges that could involve imprisonment for seven years, and that the defendant “could take the heat off his family,” including his uncle, his girlfriend and his mother, by telling the truth. Again, most of the conversation is from the police. The defendant expressed fear that he would be killed in jail. The police add that apart from the safety of his family, the defendant should be aware that his buddy was beaten up. Thereafter, the defendant, speaking with what appears to be slurred speech, stated that he was trying to answer the questions but “the medication is working.” Shortly thereafter, the defendant states “I don’t want to speak no more.” However, the interview continues without regard for this assertion of the right to remain silent.
8. Discussion. First Interview. There is no dispute that the defendant was subjected to custodial police interrogation by the Florida detectives on March 14, 2007. The first question presented for this court’s review is whether the defendant “voluntarily, knowingly and intelligently waive[d] his Miranda rights.” Commonwealth v. Jackson, 377 Mass. 319, 325 (1979), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966). He maintains that the Commonwealth did not meet its “heavy burden” of proving a knowing and voluntary waiver. Id. [A]s a matter of Massachusetts practice, the Commonwealth must prove a knowing and intelligent waiver beyond a reasonable doubt." Commonwealth v. Day, 387 Mass. 140, 145 (1982).[1] On the basis of the record before me, it cannot be said that the Commonwealth met that burden. The tape recording of the first interview indicates that the defendant was confused about the right to counsel, and, in particular, about the idea that an attorney would be provided for him without cost if he could not afford an attorney. Although the defendant signed a written *641 waiver form, this is not conclusive. Factors that are relevant on this question are (1) the defendant’s educational level (he said it was 10th grade), (2) his physical condition (he said he had not eaten in a week and had been throwing up for three days), and (3) his emotional and psychological condition (he was overcome with fear that he and his family would be killed, he cried and sobbed throughout most of the interview, and said at two different points in the interview he wanted to kill himself). When a person expresses the intention to kill himself in circumstances such as these in which there is a context which explains why the defendant may have such thoughts, the police must be extremely cautious. Although there is no per se rule that a person with a mental illness or who is mentally retarded cannot make a valid waiver of Miranda or a voluntary statement; see, e.g., Commonwealth v. McGowan, 458 Mass. 461, 472 (2010) (mildly retarded defendant); Commonwealth v. Hilton, 443 Mass. 597, 606-07 (2005) (mentally ill defendant); the law requires the exclusion of statements when mental health problems cause a person to be indifferent to his own self-protection. See Commonwealth v. Vasquez, 387 Mass. 96, 100 & n.8 (1982). While the Supreme Judicial Court has observed that “distress, even profound distress does not necessarily mean that a defendant is incapable of withholding any information he conveys,” Commonwealth v. Stroyny, 435 Mass. 635, 646-47 (2002), this case presents an extreme example. The interview reflects that the defendant knew his girlfriend had already been physically beaten. The defendant left no doubt that he believed his death at the hands of persons associated with the victim’s family was inevitable. In this case, the record before me depicts a defendant who was so upset and so overcome with fear that he and his family would be killed by the friends and family of the victim that he was unable to make a rational choice about whether or not to answer the questions put by the police. The weight of the defendant’s fear of retaliation against him and his family is comparable to the effect of the televised news broadcast on the defendant in Commonwealth v. Murphy, 442 Mass. 485, 494 n.11 (2004). Certainly, when one considers the veiy heavy burden of proof resting on the Commonwealth,[2] there is some doubt about the validity of the defendant’s waiver. That doubt must be resolved in the defendant’s favor. The court would have been reassured and might have reached a different result if the interview was conducted on the basis of open-ended questions put to the defendant by the police followed by narrative answers by the defendant. Instead, the questions by the police were mostly leading, and at critical moments consisted of efforts to minimize the crime and suggestions that it was advantageous for the defendant to speak. Moreover, the police actually suggested accident or self-defense to the defendant who up to that point had either denied his involvement or said he could not remember the details.
9. Massachusetts law also requires that the Commonwealth prove voluntariness by a standard of proof beyond a reasonable doubt. See Commonwealth v. Tavares, 385 Mass. 140, 145, 149-53 (1982). There was no physical coercion employed by the Florida police. Although the use of the technique of minimization (suggestions that the crime was understandable or that the defendant is less culpable than some may think) creates risks that the statements made by the defendant may not be voluntary, and should be avoided, it is not forbidden. See Commonwealth v. Gaboriault, 439 Mass. 84, 88-89 (2003). However, the same factors discussed above, in paragraph 8, that preclude a finding by a standard of proof beyond a reasonable doubt that the defendant waived his Miranda rights, preclude a determination that the defendant’s statement to the Florida police was voluntary. See note 2, supra.
10. Second interview. The second interview is even more problematic than the first interview. The police did not begin by restating the Miranda warnings. The police do not have to re-advise the defendant of his Miranda warnings and secure a new waiver in every case before questioning him a second or subsequent time. See, e.g., Commonwealth v. Martinez, 458 Mass. 684, 691-93 (2011). However, a second day interview is an interview after a significant lapse of time and should be preceded by a new set of warnings and another waiver. Not only did the police fail to re-advise the defendant at the outset of his Miranda rights, but they did not determine what medication he had been given after he told the police he had taken two pills despite the fact that even the audio tape reveals signs of the defendant’s impairment (slurring of his speech). In addition, the Worcester police informed the defendant that speaking to them was going to help him. At a minimum such a statement diminishes the defendant’s right to remain silent. However, more fundamentally, it is a false statement calculated to induce the defendant to abandon his constitutional rights. See Commonwealth v. DiGiambattista, 442 Mass. 423, 432-33 (2004). How can it be said that a waiver of Miranda rights, which can be asserted at any time during a custodial interrogation, remains valid when the police inform the defendant that cooperation with them and speaking to them will help his case? In addition to this regrettable mistake, when the defendant finally stated that he no longer wantéd to talk, the police made no inquiry (although it was not an ambiguous statement), but simply kept interrogating the defendant. The right to remain silent exists from the beginning to the end of the interview. See Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982). Once the right to remain silent is invoked, all questioning must cease until the defendant freely and voluntarily chooses to initiate questioning. See Oregon v. Bradshaw, 462 Mass. 1039, 1044 (1983); Michigan v. Mosley, 423 U.S. 96, 103-04 (1975); Commonwealth v. Lopes, 455 Mass. 147, 163 & n.15 (2009). In view of the actions by the police, the defendant’s medicated condition which caused him to slur his speech, his emotional condition (crying and sobbing because of fear he and his family would be killed), and the nature *642 of the police questioning (again, mostly leading questioning in which answers were suggested to the defendant), I am unable to say, by the standard of proof beyond a reasonable doubt, that the second interview was conducted on the basis of a valid waiver of his Miranda rights or that it was voluntary.
ORDER
In more than twenty-one years of service as a trial judge in both the District and Superior Courts, I have had occasion to conduct hundreds of hearings on motions to suppress statements based on allegations that there was a violation of Miranda or that the statement was not voluntary. In recent years, largely as a result of Commonwealth v. DiGiambattista, 442 Mass. 423 (2004), both trial and appellate judges commonly receive in evidence as an exhibit a video- or audio-recording of the actual custodial interrogation in a case as opposed to hearing witnesses give accounts of what happened and what was said. After viewing perhaps forty recorded custodial interrogations since DiGiambattista, I am persuaded that police departments, with input from prosecutors and others, should give consideration to recognizing a specialty designation for conducting custodial interrogations. The officers and detectives who conduct custodial interrogations face significant challenges in terms of the need to understand a complex body of state and federal law, and the use of appropriate interrogation methods. There are some important guideposts in the law. Purposeful use of deception about the existence of evidence, minimization of the gravity of the crime under investigation, and incorrect statements about the law are all techniques that should not be used. Beyond this, it is time for the law enforcement community to take into account developments in social science research about the impact of certain types of interrogation methods on persons who are likely to be more susceptible to persuasion and whose interrogations may need to be conducted differently than the interrogations of others,[3] and to reach out to other interested parties, as it did to address shortcoming with eyewitness identification procedures, to consider best practices in the area of custodial interrogations and incorporate these into the day-to-day work of police officers and detectives. The issue is not whether the police should attempt to obtain confessions. Rather, the issue is given the extraordinary weight assigned to confessions by juries, and the commitment our system has to present juries with reliable evidence, the approach to questioning persons who are in a custodial setting should be based on guidelines that are designed to promote, if not ensure, reliability. For example, in this case, most of the questions put to the defendant were leading, and many were argumentative. Very few of the questions were open-ended. In addition, when a person makes statements about killing himself in the midst of an emotionally charged interrogation, and later when it is known that he has been medicated as a result of that condition, is it appropriate to simply continue with the interrogation or should there be guidelines that provide police officers and detectives with alternatives?
For the above reasons, the defendant’s motion to suppress the first and second statements made to Florida police detectives and both Massachusetts and Florida police detectives on March 14 and March 15, 2007 is ALLOWED.

The parties have not addressed the question of whether Massachusetts law or Florida law should be applied to this issue. Since it appears that the Florida police questioned the defendant to assist the Massachusetts police and for the specific reason of gathering evidence to be used in a Massachusetts prosecution, it seems clear that Massachusetts law is applicable.

Nhe jury instruction used to express proof beyond a reasonable doubt is instructive. Perhaps the best synopsis of the concept of proof beyond a reasonable doubt is “a subjective state of near certainty.” Commonwealth v. Pinkney, 419 Mass. 341, 347 (1995).

See Saul M. Kassin, Steven A. Drizin, Thomas Grisso, Gisli H. Gudjonsson, Richard A. Leo, & Allison D. Redlich, Police-Induced Confessions: Risk Factors and Recommendations, published online July 15, 2009 as a “scientific review paper” of the American Psychology-Law Society/Division 41 of the American Psychological Association. See also William C. Thompson, An American Psychology-Law Society Scientific Review Paper on Police Interrogation and Confession, 34 Law and Human Behavior 1 (2010). Professor Thompson observes that although the organization usually addresses the legal community and the public on the basis of the views of individual members, there are times when the organization deems it important to speak as an organization. “By authorizing and endorsing Scientific Review papers, the Society makes known the consensus views of its members and lends its authority to the conclusions reached.” Id. The above paper is only the second time in 42 years that the Society has commissioned such a paper.