## COMMONWEALTH VS. ROBERT S. WILSON.

Franklin. September 8, 2004. - December 22, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Jury and jurors, Argument by prosecutor, Cross-examination by prosecutor, Agreement between prosecutor and witness, Defendant's decision not to testify, Location of defendant in courtroom, Assistance of counsel, Instructions to jury, Duplicative convictions, Verdict, Voluntariness of statement, New trial. *Jury and Jurors. Evidence,* Argument by prosecutor, Cross-examination, Impeachment of credibility, Flight, Consciousness of guilt, Motive. *Witness,* Impeachment. *Interstate Agreement on Detainers.*

Under the circumstances of a criminal trial, the judge did not err when he did not dismiss a juror who wrote a note to the judge concerning his knowledge of the defendant's brother, did not make an inquiry of the other jurors on the issue, and instructed the jurors that they should decide the case only on the evidence. [127-129]

There was no merit to the argument that the judge at a criminal trial erred in ruling that defense counsel could not impeach a coventurer's testimony with evidence allegedly of the coventurer's attempt to escape from a house of correction, where the record did not indicate that defense counsel ever attempted to impeach the witness using this evidence, and thus, there was no ruling by the judge. [129-130]

At a criminal trial, the prosecutor's remark during closing argument that a witness did not have an agreement with police officers when the witness made a statement to them did not create a substantial likelihood of a miscarriage of justice; moreover, the prosecutor's description of certain evidence as "uncontroverted" did not implicate the defendant's right not to testify, and the prosecutor did not misstate facts when he argued that one witness's statement to the police was the first time that certain parts of the story were revealed or that another witness received a weapon used in the crime a certain time after the crime had been committed. [130-134]

The cross-examination of a witness at a criminal trial regarding his failure to offer information did not create a substantial likelihood of a miscarriage of justice, where the witness had ample opportunity to explain the reason for his silence. [134-135]

The judge at a criminal trial did not err in allowing the Commonwealth to present testimony of a counsellor of a coventurer (who was not on trial) to explain the coventurer's motive for participating in the crimes alleged, where the testimony did not implicate the defendant or relate to a nontestifying codefendant, and where the information concerning the motive was relevant. [135]

In the circumstances of a criminal case, the security concerns were such that there was no error in confining the defendant to the prisoner's dock during trial. [135-136]

There was no merit to a criminal defendant's claim that his trial counsel was ineffective in failing to pursue the defendant's alibi, in not calling witnesses to testify to the victim's personal habit, in not attempting to impeach a witness with a claim that he had been involved in the crimes alleged, in failing to impeach another witness with prior inconsistent statements, in not making an argument at sentencing, or in not perfecting the defendant's direct appeal. [136-140]

This court concluded that the transportation of the criminal defendant between New Hampshire and Massachusetts during a previous criminal trial did not violate the Interstate Agreement on Detainers, St. 1965, c. 892, relative to the indictments underlying the instant trial. [140-142]

There was no merit to the criminal defendant's argument that the jury returned unauthorized verdicts. [142]

The criminal defendant did not demonstrate that the voluntariness of his admission was a live issue at trial. [142]

There was no merit to the criminal defendant's argument that the judge's instruction on moral certainty was inadequate to offset a claimed deficit in the defendant's own counsel's closing argument; moreover, there was no indication that the judge's sua sponte giving of a *Tuey-Rodriquez* charge, *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A), was coercive, and there was no error in the judge's instructions concerning joint venture or malice. [142-144]

At a murder trial, the defendant's conviction for armed robbery was not duplicative of his convictions for murder in the second degree. [144]

INDICTMENTS found and returned in the Superior Court Department on January 12, 1977.

The cases were tried before *John F. Moriarty*, J.; a motion for new trial, filed on July 9, 1996, was considered by *Francis X. Spina*, J.; motions to reconstruct the record and for juror interviews, filed on December 21, 2001, were considered by *Bertha D. Josephson*, J.; and a motion for reconsideration of the denial of the motion for a new trial, filed on August 26, 2003, was also considered by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David J. Nathanson* for the defendant.

*Steven Greenbaum*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In 1977, the defendant was found guilty on two charges of murder in the second degree and one of armed

robbery.[1] At the time, although "a claim of appeal" was filed, the defendant never pursued it.[2] However, the court later affirmed the denial of the defendant's motion to set aside the convictions made pursuant to Mass. R. Crim. P. 30 (a), 378 Mass. 900 (1979), based on claimed violations of the Interstate Agreement on Detainers (IAD). St. 1965, c. 892. *Commonwealth v. Wilson,* 399 Mass. 455 (1987). In 1996, the defendant filed a motion for a new trial, which was denied by a Superior Court judge. The defendant appealed.[3] He asserts numerous errors and asks that the court, alternatively, vacate the judgments and dismiss the indictments with prejudice, order a new trial, remand the case for an evidentiary hearing, or dismiss the armed robbery indictment as duplicative. In 2000, we transferred this case from the Appeals Court on our own motion.[4] We affirm the defendant's convictions and the denials of his motion for a new trial, motion for reconsideration, and motions for juror interviews and to reconstruct the record. We also decline to exercise our power under G. L. c. 278, § 33E.

*Facts.* We recite the facts the jury were warranted in finding, reserving certain details for our discussion of the issues. At

---

[1]The defendant was tried on two indictments charging murder in the first degree and one indictment charging armed robbery. General Laws c. 278, § 33E, as amended through St. 1974, c. 457, as it read before its amendment on July 1, 1979, required that those tried on indictments charging murder in the first degree and convicted of murder in the second degree receive review by this court. See *Commonwealth* v. *Davis,* 380 Mass. 1, 12-16 (1980).

[2]Through his attorney, the defendant contacted the clerk of the Franklin Superior Court, stating he decided not to pursue his direct appeal because he decided that a challenge to the Interstate Agreement on Detainers (IAD) was his strongest issue of law. He also stated that he decided that he did not want to have court-appointed counsel pursue his direct appeal and could not afford private counsel to do so. See generally *Commonwealth* v. *Brito,* 402 Mass. 761, 762 n.1 (1988) (even where defendant "waives" direct appeal, court still reviews murder conviction under G. L. c. 278, § 33E).

[3]The Appeals Court allowed the consolidation of the defendant's appeal from the denial of his motion for a new trial with his direct appeal that was filed, but never pursued.

[4]It is unclear how the case came to be entered in the Appeals Court. See note 1, *supra.*

The appeal was stayed to permit a Superior Court judge to consider the defendant's motion to reconstruct the record on appeal and his motion for juror interviews, both of which were denied. A motion to reconsider the denial of his motion for a new trial also was denied.

trial, Michael Renz, one of the coventurers in the murders, testi-
fied for the Commonwealth as follows.[5] On March 24, 1976,
Renz, the defendant, and Robert Smith, met in New Hampshire
and planned to rob an auto body shop in Greenfield, Mas-
sachusetts, where Smith formerly had been employed. Smith
told the others that the shop owner always carried a large
amount of cash. The three men drove in Renz's car to the apart-
ment of a woman he and the defendant knew, where he retrieved
a laundry bag containing a twelve-gauge sawed-off shotgun, a
.38 caliber pistol, ammunition, shoelaces, and ski masks. Renz
was carrying a hunter's knife with a four inch blade in a sheath.

The men then set off for Greenfield. During the course of the
drive, Smith, who was supposed to be the getaway driver,
expressed a grudge against the owner and stated that he wanted
to cut his throat. Renz testified that he did not like knives and
demurred; the defendant stated that he would do it.

When they arrived at the auto body shop, they noticed a man
in the office, but he was not the owner. They drove around until
they saw that the owner also was in the office and decided to
proceed with the robbery and killing. They parked the car a
distance away and Renz and the defendant got out of the car.
Renz carried his knife and the shotgun. The defendant carried
the .38 pistol.

The pair entered through the open door to the shop's office.
The defendant grabbed the owner and dragged him into the
workshop area. Renz kept the second man in the office area at
gunpoint. When the owner would not reveal where the money
was, the defendant struck him several times, fracturing his
skull. At the defendant's direction, Renz brought the other man
into the workshop area, made him lie face down on the floor,
and tied his hands and feet with the shoelaces.

The defendant and Renz returned to the office to look for
money, taking a tin box they found in a locked file cabinet. The
defendant later returned to the shop owner, took the knife out of
Renz's sheath and used it to slash the owner's throat. The cut
was so deep that it went through the larynx and reached the

---

[5]The Commonwealth called two other witnesses who were acquaintances of
the defendant. Their testimony will be discussed where relevant to the issues
raised on appeal.

owner's spine, leaving a cut mark on one of the bones. Renz, at the defendant's urging, shot the other man in the back of the head. Renz also fired a second time. The pair then returned to the car which Smith had parked beside the bay doors of the shop.

On their way back to New Hampshire, they decided that the defendant would throw the pistol, knife, and tin box into the Connecticut River from a bridge. The defendant got out of the car at the bridge, taking the weapons and box with him. The other men followed in the car and when they picked him up a few minutes later, the defendant told them that he had thrown the weapons in the river.

Renz testified to these facts in exchange for a promise that the Commonwealth would recommend that he receive a sentence of from thirty to fifty years on the armed robbery indictment and that he be allowed to plead guilty to murder in the second degree.[6] Renz hoped that he would be eligible for parole after twenty years.

The defendant did not testify. Defense counsel's theory was that Renz was lying, the defendant was not even present at the robbery, and that the defendant's brother, Donald Wilson, was the third person who committed the robberies and murders with Renz and Smith. The defense called two witnesses. The first testified that Renz told him that he killed two people by shooting one in the head and cutting the other's throat. The second testified that Renz told him that he shot one victim in the head. This individual also testified that Renz said that Donald Wilson was the person who was present during the robbery and, because Donald Wilson stood there crying and saying he could not kill the owner, Renz pulled out his knife and cut the owner's throat.

After the jury retired for deliberations, one juror sent a note to the judge indicating that he had associated the defendant's brother, Donald Wilson, with a specific crime for which he had been granted immunity.[7] The judge conducted a lobby conference with the juror from 8:40 p.m. until 9:30 p.m. After the lobby

---

[6]Renz also had to testify truthfully before the grand jury investigating the murders and at the trial of Robert Smith. Renz testified that he believed that the sentences he received in Massachusetts would run concurrently with his sentences for other armed robberies he committed in New Hampshire.

[7]The note said:

conference, the jury returned to the court room and were instructed by the judge to base their verdicts "on the evidence which you have heard here in this courtroom, and nothing else." Counsel for the defendant indicated that he did not wish to add anything further.

*Discussion.*[8] On appeal in this case are issues in the defendant's direct appeal, the denial of his motion for a new trial, the denial of his motion for reconsideration of his motion for a new trial and the denial of his motions for juror interviews and to reconstruct the record. Our consideration of the issues on direct appeal will dispose of some of the issues the defendant raises concerning the denials of his motions, avoiding any repeat discussions.

1. *Issues on direct appeal.*

a. *Note from juror.* The defendant argues that the note from the juror could mean only that the juror knew of the defendant's involvement in another murder of which the defendant had been convicted.[9] He contends that the judge erred when he did not dismiss the juror who wrote the note concerning his knowledge of Donald Wilson, did not make an inquiry of other jurors on

---

"Your Honor:

"During the deliberations, I feel that I have associated *Donald* Wilson with a specific crime that has []resulted in his immunity from his prosecution . . . . I feel that having made this association it could affect my verdict or it could possibly influence the verdict of the other 11 jurors.

"I don't believe I should indicate how or why this may affect either myself or group [*sic*] since I'm not sure whether our deliberations are confidential.

"If I should be more specific either regarding this association or its possible affect on the jurors, I would like to be instructed how much I should say or write." (Emphasis in original.)

[8]Both parties filed motions to expand the record. We deny the Commonwealth's motion to expand the record, and the defendant's motion to expand the record as it pertains to the record on appeal in *Commonwealth* v. *Wilson*, 399 Mass. 455 (1987). We grant the defendant's partially assented to motion to expand the record to include the Greenfield police department reports and the alleged polygraph examination of Michael Renz.

[9]In *Commonwealth* v. *Wilson*, 381 Mass. 90 (1980), this court affirmed the defendant's convictions of murder in the first degree of three members of a Tewksbury family. The defendant's brother, Donald, testified in that case under a grant of immunity, and was promised he would be given a new identity. *Id.* at 93 n.5.

this issue, and merely instructed the jurors that they should decide the case only on the evidence. The defendant asserts that these errors denied him his right to an impartial jury under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He argues that, at the very least, the case should be remanded to the Superior Court for juror interviews because the jury were exposed to an extraneous influence that was extremely prejudicial to the defendant.[10]

Transcripts of only the trial testimony were ordered. Before us there is a handwritten "docket" showing that a lobby conference occurred.[11] The docket does not indicate who attended the lobby conference, nor does it indicate any discussion or objections that took place. The record does reveal that the judge emerged from the conference and, in the presence of both defense counsel and the prosecutor, gave the further instruction to the jury described above.

More than twenty years passed between the time of the trial and the defendant's filing of his motions to conduct juror interviews and reconstruct the record. By that time, both the judge and the court stenographer who recorded the lobby conference were deceased. Defense counsel has no recollection of a conference in the judge's chamber nor of any "matters regarding extraneous influences on the jury."

There was no error. The note did not indicate that the juror knew anything about the *defendant*, it addressed the defendant's brother, Donald. In fact, the juror underscored Donald's name. The defendant's brother was mentioned by defense counsel, because it was his theory that it was Donald who had participated in the robbery and murders. Furthermore, Donald's immunity

---

[10]In his reply brief, the defendant adds to his argument, asserting that his appellate attorney was ineffective for not examining the court file and finding the juror note. The attorney's affidavit indicates that she did not need to see the file because she did not intend to appeal from the convictions. As noted, *supra*, the defendant chose not to pursue the appeal from his convictions. Particularly in light of our conclusion concerning this issue, the defendant has not shown that he was deprived of effective assistance of counsel.

[11]Both parties and the judge who denied the defendant's motions for juror interviews and to reconstruct the record accepted this "docket" as authentic. We assume, without deciding that it is. The notation on this docket refers to juror 114, seat 5. This was the juror who signed the note.

for other crimes was raised by defense counsel in his cross-examination of Renz. Defense counsel implied that Renz needed someone to trade for a plea agreement and, once Renz believed that Donald Wilson had immunity, he needed someone else to offer police officials in trade for a deal and chose to implicate the defendant instead.[12]

We do not accept the defendant's assumption that this information is, in fact, extraneous to the jury's deliberations. Moreover, even if it were extraneous, the record allows us to conclude that the judge used the lobby conference to follow the procedure set out in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978) ("determin[ing] whether the material goes beyond the record and raises a serious question of possible prejudice"), and to conclude that the judge did explore the possibility of harm to the defendant. The reasonable inference is that the judge concluded that any possible harm could be corrected by the further instruction. The fact that defense counsel did not object to the judge's further instruction to the jury and declined the court's invitation to add anything lends support to the inference that proper procedures were followed. Moreover, where, as here, the unavailability of a transcript is not the fault of the Commonwealth, but the result of the defendant's affirmative choice not to pursue an appeal, we think there ought to be a presumption of regularity accorded to earlier proceedings. See generally *Commonwealth* v. *Comita*, 441 Mass. 86, 93-94 & n.12 (2004); *Commonwealth* v. *Lopez*, 426 Mass. 657, 661, 665 (1998); *Commonwealth* v. *Pingaro*, 44 Mass. App. Ct. 41, 49 (1997).[13]

b. *Exclusion of Renz's attempted escape.* The defendant argues that the judge erred in ruling that defense counsel could not impeach Renz's testimony with evidence of what the defendant alleges was Renz's attempt to escape from the Franklin house of correction. The defendant argues that the escape attempt demonstrated consciousness of guilt and bias in numerous ways, including that Renz had serious misgivings about whether he could stick to his story. There is a passing reference to the

---

[12]In fact, Donald Wilson did not have immunity for the Greenfield murders.

[13]Because we conclude that the judge did not err in his handling of the juror's note, it follows that the motion judge did not err in denying the defendant's motions to reconstruct the record and for juror interviews.

escape in the record, where defense counsel discussed the upcoming testimony of Renz.[14] This issue does not merit our attention except to say that nothing in the record indicates that defense counsel ever attempted to impeach Renz using evidence of his escape and thus there was no ruling by the judge.[15] Accordingly, we find no error.

c. *Errors in the prosecutor's closing statement.* The defendant alleges several errors in the prosecutor's closing argument. We analyze the prosecutor's remarks considering the argument as a whole, the judge's instructions to the jury, and the evidence at trial. *Commonwealth* v. *Beland,* 436 Mass. 273, 289 (2002), citing *Commonwealth* v. *Mello,* 420 Mass. 375, 380 (1995). We consider each claim of error in turn.

(1) At trial, the Commonwealth called Howard Devoid as a witness. He testified that, in the spring of 1976, when he asked the defendant if he was involved in the Greenfield murders, the defendant admitted the he cut a man's throat and that Renz shot the other victim twice in the head. During cross-examination, Devoid testified that, at the time he told the police about the defendant, the police "didn't offer me anything." However, he admitted that an armed robbery charge was still in the pretrial phase, and that the police were going to see whether they could help him get "a lighter sentence." Further, Devoid stated that the police had not yet given him anything and that he had not been moved from his correctional facility.

---

[14]Defense counsel said, "Those are the cases (indicating); so that it would be — escape . . . that's still pending."

The record is unclear whether this reference concerns an attempted escape from the Commonwealth's custody, as the defendant alleges. In addition, in a document submitted by the defendant (discussed *infra*), it appears as if Renz attempted to escape from a New Hampshire prison. Nothing turns on either alleged escape attempt, and thus it is irrelevant whether there were one or two attempts.

[15]In his reply brief, the defendant argues that the transcript indicates that defense counsel filed a memorandum in support of his position and thus the judge did preclude him from examining Renz about his escape. A careful reading of the transcript shows that the discussion of the defendant's memorandum concerned the introduction of Renz's criminal records. Defense counsel made a passing reference to the "Chase case" which the defendant himself claims is *Commonwealth* v. *Chase,* 372 Mass. 736, 749-751 (1977), a case that concerns the introduction of a prior conviction to impeach the credibility of a witness.

Documents indicate that Devoid did have some sort of an agreement at the time of trial and that he was moved from one facility to another.[16] The Commonwealth disclosed Devoid's agreements to defense counsel before trial. The Commonwealth disclosed that the details of Devoid's agreement concerning his sentencing on charges in New Hampshire were not a matter of public record. However, the Commonwealth was made aware that one of the conditions New Hampshire imposed on the agreement was that Devoid testify truthfully at the defendant's trial. In addition, police records indicate that Devoid was transferred from the Cheshire house of correction in July, 1976, because of his fear of the defendant. However, Devoid was returned by September, 1976.[17]

Despite this information, in closing argument, the prosecutor stated that, although Devoid was looking for a deal, he "didn't get any deal." There was no objection. Concerning Devoid's testimony about moving, there is nothing in the records that show his being moved was tied to his testimony. Concerning the prosecutor's comment that Devoid had no deal, we reject the Commonwealth's argument that, technically, the testimony is not false because no one in Massachusetts (State police, Greenfield police or district attorney's office) "gave" Devoid anything. That there was some kind of an agreement was evident in the Commonwealth's disclosure to defense counsel that Devoid's sentencing in New Hampshire was conditioned on his truthful testimony at the defendant's trial. However, we conclude there was no substantial likelihood of a miscarriage of justice.[18]

The prosecutor made his remark about the lack of an agree-

---

[16]The documents on which the parties rely were not admitted in evidence at trial. However, as the parties do not contest them, we assume, without deciding, that the documents are authentic and that what the documents describe is correct.

[17]Whether the prosecutor knew of the details in the police records is unclear.

[18]The defendant also claims that defense counsel's failure to object to this argument constitutes ineffective assistance of counsel. The ineffective assistance of counsel claim adds nothing as, in these circumstances, we look to see whether there is a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Carmona*, 428 Mass. 268, 274 (1998), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

ment in the context of discussing the timing of Devoid's state- ment to police: Devoid's statement concerning the defendant's admission to him came months before Renz's. The prosecutor also admitted that witnesses like Devoid were looking for a deal. In addition, although Devoid denied that he had a deal, under vigorous cross-examination, Devoid admitted that he hoped to get a deal on his sentence and that until the defendant admitted to his part in the murders, Devoid had tried, unsuc- cessfully, to get a deal. He also admitted that the police told him who the suspects were and how the victims were killed before he spoke to the defendant. Finally, the judge told the jurors to decide the case on the evidence and that closing argu- ments were not evidence. Absent evidence to the contrary, the jury are presumed to follow the judge's instructions. *Com- monwealth* v. *Degro*, 432 Mass. 319, 328 (2000). Given these circumstances, we cannot say that the error likely influenced the jury's conclusion.

(2) Devoid testified that he gave his statement to police concerning the defendant's admission to the murders in the spring of 1976. Renz, whose testimony was essentially the same as Devoid's, testified that he gave his statement to police in October, 1976. Renz also testified that he knew that Devoid and another witness had already given statements to police. In his closing, the prosecutor argued that "the uncontroverted fact is that the first time any evidence of what had really occurred inside that building came from [the defendant], not Mr. Renz."

The defendant argues that because only he could have cor- roborated Devoid's statement, the prosecutor's use of the word "uncontroverted" violated the defendant's constitutional right not to testify. There was no objection.

Because it can implicate a defendant's right not to testify, "[a] claim that certain evidence is uncontested should be made with caution . . . ." *Commonwealth* v. *Hawley*, 380 Mass. 70, 83 (1980), quoting *Commonwealth* v. *Borodine*, 371 Mass. 1, 11 (1976), cert. denied, 429 U.S. 1049 (1977). On the other hand, the prosecutor is allowed to emphasize the strong points of the Commonwealth's case and the weak points of the defendant's case. *Commonwealth* v. *Feroli*, 407 Mass. 405, 409 (1990). Here, in context, the prosecutor's comment was directed at the

sequence of disclosures concerning the murders. The reference was to the fact that the details of the murders that Devoid provided in the spring of 1976 preceded, and were consistent with, the details Renz provided a few months later. The prosecutor's statement was directed at the strong points of its case. There was no error.

(3) The defendant next argues that Devoid's credibility was a crucial issue in the case. He argues that the defendant's convictions should be reversed, despite the lack of objection, because the prosecutor "recklessly misstated the facts" when he argued that Devoid's statement to police was "the first time any story came out as to what happened." In fact, as discussed, Devoid admitted on cross-examination that the police had told him the names of the suspects (including the defendant's) and how the victims were killed before he spoke to the defendant. Although the police did tell Devoid the names of the suspects and how the victims died, Devoid's statement about the defendant's cutting the owner's throat and Renz's shooting the other victim was the first time that part of the story came out. It was in this context that the prosecutor made the statement. *Commonwealth v. Rivera*, 430 Mass. 91, 101 (1999) (counsel entitled to argue reasonable inferences drawn from evidence). There was no error.

(4) At trial, the Commonwealth called another acquaintance of the defendant, Michael J. Sullivan. Sullivan testified that the defendant gave him a shotgun that had been identified by Renz as the one he took to the murder scene and asked him to "get rid of it." Sullivan testified that he buried the gun, but on April 11, 1976, less than three weeks after the murders, he lead police to the site and it was retrieved. Under vigorous cross-examination, Sullivan responded to defense counsel's questions concerning when the defendant gave him the shotgun, including whether he had it for one month before the police found it[19] with, "I don't recall."

The defendant claims that, over objection, the prosecutor misstated evidence when he argued that "sometime within that

---

[19]One month before the police recovered the shotgun would have meant that Sullivan had the shotgun before the murders were committed.

period of fourteen days after the killing . . . the shotgun that Renz carried was in the possession of the [defendant]."

Renz had identified the shotgun as the one he carried with him the night of the murders. Sullivan testified that the same shotgun was the one the defendant gave to him to dispose of. The reasonable inference is that Sullivan received the shotgun sometime after the murders were committed. See *Commonwealth* v. *Rivera, supra.* There was no error.

d. *Prosecutor's cross-examination of Robert Houghton.* At trial, the defendant called Robert Houghton, another acquaintance of the defendant, who testified that, in November, 1976, while he and Renz were in prison together, Renz told him that he had shot one man and then had to slit the other man's throat because Donald Wilson was crying and could not do it. He also testified that Donald Wilson talked to him about the murders while they were in prison together. Houghton wrote a letter to the defendant concerning his information approximately two weeks before the defendant's trial.

On cross-examination, the prosecutor questioned Houghton concerning whether he talked to either the defendant, Robert Smith, or authorities, when Renz first told him what happened.[20] On redirect examination, Houghton explained that, in prison, telling authorities the confessions of fellow prisoners can be dangerous.

The defendant argues that the prosecutor improperly questioned Houghton regarding his failure to offer information because the prosecutor failed to lay the proper foundation as outlined in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296 (1981), to show that Houghton's silence was akin to a prior inconsistent statement and thus could be used to impeach Houghton's credibility. See also *Commonwealth* v. *Berth*, 385 Mass. 784, 790-791 (1982) (endorsing *Brown* procedure). The Commonwealth argues, in part, that the procedure to lay that foundation was articulated in 1981, approximately four years after the defendant's trial and does not apply retroactively. We

[20]Houghton apparently had contact with both Smith and the defendant in prison. The defendant and other witnesses were incarcerated at various prisons in both Massachusetts and New Hampshire. We need not specify the prison except where relevant.

need not decide whether the procedures established by the *Brown* case apply to the impeachment of Houghton or whether the prosecutor failed to establish the proper foundation because we conclude that the use of the information to impeach Houghton did not create a substantial likelihood of a miscarriage of justice. Houghton had ample opportunity to explain that the reason for his silence was that, because he was in prison, it would be "bad news" to tell authorities.

e. *Witness testimony concerning Smith's motive.* The judge allowed the Commonwealth to present testimony of a former career counsellor of Robert Smith to explain Smith's motive for participating in the robbery and murders. The counsellor testified to the reasons Smith might harbor ill will toward the victim who was his former employer. The defendant argues that the testimony violated the rule established by *Bruton* v. *United States*, 391 U.S. 123, 126 (1968) (at joint trial, prohibiting admission of extrajudicial statement made by nontestifying codefendant where statement implicates another defendant). See *Commonwealth* v. *Adams*, 416 Mass. 55, 57-58 (1993). There is no merit to the defendant's claim. The testimony did not implicate the defendant at all. Moreover, this was not a joint trial and thus Smith was not a nontestifying codefendant. The *Bruton* rule does not apply. We also reject the defendant's argument that information concerning Smith's motive was irrelevant, as it helped explain why the perpetrators slit the owner's throat.

f. *Defendant's placement in the prisoner's dock.* Although the record is scant, it is not disputed that the defendant was confined to the prisoner's dock at trial. In addition, there is a reference in the record to a court officer's relaying to defense counsel that the defendant was having "a problem with his system" for which the court took a recess, pointing to at least the possibility that he was shackled.

Absent security concerns, confining a defendant to a prisoner's dock violates that defendant's due process rights. *Moore* v. *Ponte*, 186 F.3d 26, 36 (1st Cir.), cert. denied, 528 U.S. 1053 (1999). The *Moore* court, *id.* at 34-36, held that this rule, established in *Young* v. *Callahan*, 700 F.2d 32 (1st Cir.), cert. denied, 464 U.S. 863 (1983), would apply to Moore's 1976 conviction of murder in Massachusetts. See *Com-*

*monwealth* v. *Moore*, 379 Mass. 106 (1979). There is nothing in the record regarding security concerns on the part of the judge, nor was there an instruction to the jury.

The defendant argues that this confinement had a prejudicial effect on the jurors and that the defendant had to communicate with counsel through the court officers. We conclude, however, that in the specific circumstances of this case, the security concerns were such that there was no error. The defendant had already been convicted of murdering three members of a Tewksbury family.[21] As discussed *supra*, transcripts of only the trial testimony were ordered and the court reporter is deceased. The defendant has not demonstrated that there were insufficient security concerns to conclude that the judge violated his due process rights by putting him in the prisoner's dock.[22] Moreover, the defendant's current counsel has concluded that the defendant had to communicate with his trial counsel through court officers based on a single reference to a court officer's telling defense counsel that the defendant was having trouble with "his system." The defendant has not shown that he was denied communication with counsel.

g. *Ineffective assistance of counsel.* The defendant argues that counsel made several errors denying him his right to effective assistance of counsel.[23] Most of the issues he raises in his direct appeal were raised in his motion for a new trial or his motion

[21]This court affirmed his convictions in *Commonwealth* v. *Wilson*, 381 Mass. 90 (1980).

[22]We reject the defendant's comparison of his position with that of Renz. Without citation to the record, the defendant asserts that there were no security measures taken with regard to Renz while he testified. There is nothing in the record that reveals anything concerning security measures and Renz.

[23]We decline the defendant's invitation to give consideration to his trial attorney's career problems, most of which postdate his trial. In 1973, the defendant's trial attorney was censured in Massachusetts for fraudulent conduct in negligence cases; he was disbarred in Massachusetts in 1979 for defrauding a client; in 1980, he was convicted in Louisiana of unlawfully conspiring to aid and abet the crime of bail jumping. *Kelley* v. *Singletary*, 238 F. Supp.2d 1325, 1328 (S.D. Fla. 2002), rev'd on other grounds, 377 F.3d 1317 (11th Cir. 2004). Although this history is distressing, none of the attorney's wrongdoing pertains to his competence as defense counsel in this case. Moreover, the defendant's argument is undermined by two affidavits he submitted with one of his motions. Both affidavits attest to the attorney's reputation for great skill and competence. We reject the defendant's argument

for reconsideration. We consider each in turn, noting that some of the claimed errors were not, technically, trial errors. Because we review this case under G. L. c. 278, § 33E, we use the more favorable standard of whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Carmona*, 428 Mass. 268, 274 (1998), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). "We will, however, give trial counsel's tactical decisions due deference." *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003), citing *Commonwealth* v. *Fisher*, 433 Mass. 340, 354 (2001). In addition, tactical decisions are ineffective assistance of counsel only if they are "manifestly unreasonable when made." *Commonwealth* v. *Gaboriault, supra* at 90, quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

(1) The defendant argues that defense counsel failed to pursue the defendant's alibi that he was working as a bartender at Stella's Sub Shop in Keene, New Hampshire, at the time of the murders. He argues that it was ineffective assistance of counsel for defense counsel not to elicit the alibi from the police officer the defendant told and not to call the person for whom he was bartending as a witness.[24] He also argues that defense counsel's reference to the witness in his cross-examination of Renz amounted to "very nearly promising" the jury that he would call the witness and, therefore, defense counsel had a constitutional duty to attempt to do so.

The defendant's argument has no merit. Defense counsel's reference to the witness in his cross-examination of Renz demonstrates that defense counsel was aware of the defendant's alibi. In addition, in an affidavit submitted by this alleged alibi witness in support of the defendant's motion for a new trial, the individual states that he was "out west" from June, 1976, until

that defense counsel was not prepared for this trial. The record reveals a well-prepared attorney.

[24]We agree with the Commonwealth that defense counsel could not have elicited the defendant's alibi from the police officer because it was inadmissible hearsay. The defendant argues, citing *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), that this alibi could have been elicited as evidence that there was a rush to judgment by police. We reject this argument because it would amount to second guessing trial strategy. See *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003).

June, 1984, and did not know he was needed to testify. The defendant was indicted in January, 1977. The defendant has failed to show that defense counsel even knew how to contact this witness.[25] Finally, we find no merit in the defendant's argument that defense counsel's reference to the alibi witness amounted to "very nearly promising" to call that witness. Cf., e.g., *Ouber* v. *Guarino*, 293 F.3d 19, 27-31 (1st Cir. 2002) (counsel ineffective for promising jury over and over to call defendant to testify but failing to do so; noting that sometimes such a decision could fall "within the broad universe of acceptable professional judgments").

(2) There was no evidence of forced entry into the auto body shop. However, the defendant argues that defense counsel erred in not calling employees of the auto body shop who told police that the owner habitually kept the door to the office locked after hours. The defendant argues that his trial counsel could have used this information to show that the owner would have opened a locked door only for a combination of Smith (the former employee) and Renz, but not for Wilson and Renz.

We reject the defendant's argument that the owner's habit of locking his door is a business habit or custom. Instead, it is a personal habit and would have been inadmissible at trial. See *Palinkas* v. *Bennett*, 416 Mass. 273, 277-278 (1993); *Figueiredo* v. *Hamill*, 385 Mass. 1003, 1004 (1982). Cf. *Commonwealth* v. *Carroll*, 360 Mass. 580, 587 (1971) (police department practice); *Commonwealth* v. *Torrealba*, 316 Mass. 24, 30 (1944) (custom of providing sales slip with every purchase). There was no ineffective assistance of counsel.

(3) The defendant argues that defense counsel was ineffective for not attempting to impeach Howard Devoid with the transcript of a police interview with a woman named Susan Bates who claimed that Devoid told her he possibly had something to do with the murders in this case. He argues that this would have alerted the jury to Devoid's fear of prosecution in his own right and made the jury view his testimony more skeptically.

There was no ineffective assistance of counsel. Had defense

---

[25]This alibi witness is now deceased.

counsel asked Devoid if he told Bates that he was involved in the murders, Devoid would have denied it. It was not manifestly unreasonable for defense counsel not to have used the alleged statement. The defense theory was that Donald Wilson was with Renz, and the question would not have assisted the defense theory. In addition, on cross-examination, defense counsel did elicit from Devoid that the police initially thought that he committed the crime.

(4) The defendant next argues that defense counsel was ineffective because he failed to impeach Renz with prior inconsistent statements. Renz wrote a letter in 1976, in which he stated that Greenfield police offered him $35,000 to testify against the defendant and denied knowing anything about the murders.[26] In addition, the defendant argues that defense counsel should have used information from Renz's New Hampshire polygraph examination[27] to cross-examine Renz concerning his alleged attempt to escape from a New Hampshire prison and his statement that guns were stored at his mother-in-law's house rather than at the address about which he testified.

Use of the letter would have been counterproductive, as the letter also stated that the defendant wanted Renz to write it. Information concerning Renz's escape was not relevant. See note 14, *supra*. Moreover, the guns to which Renz refers are not the same guns at issue in the defendant's trial. There was no ineffective assistance of counsel.

(5) The defendant next argues that defense counsel was ineffective for making no argument at sentencing or even requesting a concurrent sentence.[28] The defendant argues that his military service should have been put before the judge. The defendant argues that, due to these deficiencies, the judge

[26]This letter has not been authenticated. As the parties do not contest its authenticity, we assume, without deciding, that Renz is the author.

[27]It is not clear that what is in the record is the actual polygraph examination. Moreover, this document has not been authenticated. However, as the parties do not contest its authenticity, we assume, without deciding, that it is Renz's polygraph.

[28]The defendant also argues that the judge was under the mistaken impression that the defendant was convicted of four, rather than three murders in the Tewksbury case. At the time, the defendant was serving four consecutive life sentences for the three murders and for armed assault in a dwelling. In *Commonwealth* v. *Wilson*, 381 Mass. 90, 91 n.2, 124-125 (1980), the court amended

sentenced him to consecutive sentences for the armed robbery. There is no substantial likelihood of a miscarriage of justice. There were mandatory life sentences for the murders. G. L. c. 265, § 1. In addition, the brutality of the murders and the defendant's criminal history would have overshadowed his military service.

(6) The defendant also argues that his posttrial defense counsel were ineffective for not securing or reading the transcript, for not perfecting his direct appeal, and in failing to pursue the now-deceased alibi witness. The issue of the alibi was discussed above and need not be repeated here. Concerning the pursuit of the direct appeal, we have already discussed that the defendant chose to pursue the alleged violation of the IAD, rather than the direct appeal. See note 2, *supra*. In addition, a claim of direct appeal was filed, preserving the defendant's rights, and the record demonstrates that the defendant received copies of the transcripts and that both attorneys worked on the appeal the defendant chose to pursue.

h. *Revisiting the court's decision in the defendant's previous appeal.* The defendant asks us to revisit the court's decision in *Commonwealth* v. *Wilson*, 399 Mass. 455 (1987), citing intervening case law.[29] Ordinarily we would not consider such a request, because the defendant should have filed a petition for rehearing to challenge the contents of that decision. See Mass. R. A. P. 27, as appearing in 396 Mass. 1218 (1986). However, because the case is here on direct appeal under G. L. c. 278, § 33E, we will review the decision as part of our plenary review of the case. We review the defendant's claims of error under the substantial likelihood of a miscarriage of justice standard.

In April, 1977, the defendant was brought to Middlesex County for trial on the Tewksbury murders. Relying on *State* v. *Sephus*, 32 S.W.3d 369 (Tex. Ct. App. 2000), he argues that, under Article IV(e) of the IAD, the defendant had to be brought to trial on the murders in this case within 120 days of his being

the defendant's life sentence for armed assault to run concurrently with his three consecutive life sentences for the murders.

[29]He also argues that if the court declines to reconsider the decision in *Commonwealth* v. *Wilson*, 399 Mass. 455 (1987), the court should consider whether the defendant received ineffective assistance of counsel for failure to file a petition for rehearing and make relevant arguments.

brought to Middlesex County for trial on the Tewksbury murders (or the indictments in this case had to be dismissed with prejudice), and that transporting the defendant between New Hampshire and Massachusetts during the Tewksbury trial should be considered a violation of the IAD relative to the murders in this case.

We are not persuaded by the *Sephus* case, which contains no analysis of the statutory scheme and cites no authority for its conclusion. In *United States* v. *Mauro*, 436 U.S. 340, 345 n.4 (1978), the case relied on in *Commonwealth* v. *Wilson*, *supra* at 460, the Court stated:

> "Article VI (e) requires the dismissal of the indictment against a prisoner who is obtained by a receiving State if he is returned to his original place of imprisonment without first being tried on the indictment *underlying the detainer and request by which custody of the prisoner was secured*" (emphasis added).

The Court's emphasis on only the detainer and request by which custody was secured comports with our understanding of the statute's scheme. See *Fasano* v. *Hall*, 476 F. Supp. 291, 293-294 (1979), aff'd, 615 F.2d 565 (1st Cir.), cert. denied, 449 U.S. 867 (1980) (no violation of IAD where defendant was returned to Connecticut between trials on unrelated indictments in Suffolk and Middlesex Counties); *Boyd* v. *State*, 51 Md. App. 197, 205-207, aff'd, 294 Md. 103 (1982) (read as whole, IAD does not require unrelated indictments in different counties to be tried before returning defendant to District of Columbia correctional facility, where defendant brought to State under one indictment). Given this case law, we remain of the view that there was no violation of the IAD.[30]

Moreover, even if we were to assume, as the defendant argues, that a fugitive warrant was lodged against the defendant in New Hampshire in August, 1976, and that a fugitive war-

---

[30]Given our conclusion that there was no violation of the IAD, we need not address the defendant's argument that executive agreements cannot be used to circumvent the IAD.

rant is the same as a detainer, these assumptions are of no consequence under the IAD, which requires a request for temporary custody to trigger its terms. *Commonwealth* v. *Wilson*, *supra* at 460.

i. *Other issues.* (1) The defendant argues that he is entitled to a new trial because the jury returned "unauthorized" verdicts of murder in the second degree and armed robbery instead of felony-murder in the first degree. The defendant's argument has no merit. The judge properly instructed the jury they could find the defendant guilty of murder in the second degree and the jury were warranted in so finding. *Commonwealth* v. *Paulding*, 438 Mass. 1, 10 (2002) (murder in second degree instruction proper where there is "evidence of malice that would support a conviction of murder on the theory of deliberately premeditated murder or murder committed with extreme atrocity or cruelty").

(2) The defendant argues that the judge erred in failing to ascertain whether the defendant's admission to Devoid was voluntary. The defendant did not raise the issue at trial and points to nothing in the record to indicate that the statement was not voluntary, therefore he has not demonstrated that it was a live issue requiring the judge to address it. *Commonwealth* v. *O'Brien*, 432 Mass. 578, 590 (2000) (voluntariness instruction not required where subject never arose and counsel did not raise issue in closing argument because it would have been inconsistent with defense theory that defendant did not commit crime).

(3) The defendant argues that although the judge's instruction on moral certainty was proper under *Commonwealth* v. *Watkins*, 425 Mass. 830, 837 (1997), it was inadequate because defense counsel repeatedly invoked the concept during his closing. There is no merit to the defendant's claim that the judge's instruction was inadequate to offset a claimed deficit in his own counsel's closing. We will not second guess trial tactics. *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003).

(4) The defendant argues that the judge erred when, after a twenty-four hour period, he gave the *Tuey-Rodriquez* charge where there was no indication that the jury were deadlocked.

See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A). There was no error. Notification that the jury are deadlocked is not a prerequisite for the charge; rather, it is within the judge's discretion to give it. *Commonwealth* v. *Brunelle*, 361 Mass. 6, 12 (1972). Although the record is unclear concerning the actual number of hours the jury deliberated, it had been twenty-four hours over two days since the jury began their deliberations. This lapse of time is reasonable. *Commonwealth* v. *Rodriquez*, *supra* at 97 (charge given after jurors deliberated over seven hours); *Commonwealth* v. *Brunelle*, *supra* (charge given after jury deliberated total of five and one-half hours). Although a judge's giving the charge sua sponte runs a risk of acting prematurely, *Commonwealth* v. *Scanlon*, 412 Mass. 664, 678-679 (1992), there is no indication that the charge was coercive. The jury continued to deliberate for another entire day before returning their verdicts.

(5) The defendant argues that the judge erred in his instructions concerning joint venture and malice. We consider each in turn.

(a) The defendant argues that the judge failed to instruct the jurors that a joint venturer must have the same intent as the principal. The judge's instructions[31] are nearly identical to instructions that were upheld in *Commonwealth* v. *Dyer*, 389 Mass. 677, 683-684 (1983) (joint enterprise instruction did not deprive defendant of due process even though instruction failed

---

[31]The judge instructed the jury as follows:

"In order to be engaged in a joint criminal enterprise, however, a person must actually participate in it. A defendant may not be found guilty of a crime merely because he was present at the scene at the time the crime was committed. And that is true even though a defendant may have had knowledge that the crime was to be committed and took no affirmative action to prevent it, and even though he subsequently concealed or aided in the concealment of the completed crime. Guilt by association is not part of our law. What must be proved is that the defendant, in some way, associated himself with the venture, that he participate in it as something that he wished to bring about, that he sought by his action to make the venture succeed. He must, in other words, have been an active participant, as distinguished from merely having been present when some other person or persons committed a criminal act."

to include element of intent where in context, instructions conveyed to jury that they had to find requisite intent). There was no error.

(b) The defendant argues that the judge erroneously defined malice as "includ[ing] any intent to inflict injury upon the deceased without some legal excuse or palliation." There was no objection. This was a proper statement of the law as it existed at the time. *Commonwealth* v. *Hodge (No. 2)*, 380 Mass. 858, 865 (1980), and cases cited.

Subsequent case law has established that the jury is supposed to be instructed that malice may be proved in any one of three ways: (1) intent to kill, (2) intent to cause grievous bodily harm, or (3) intent to do an act that, in circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result. *Commonwealth* v. *Russell*, 439 Mass. 340, 343-344 (2003). *Commonwealth* v. *Gaboriault, supra* at 91-92. In this case, even if there was error, it was not prejudicial because malice can be "ineluctably inferred" from the evidence that the victims' injuries were inflicted with an intent to kill or at least with intent to cause grievous bodily harm. *Commonwealth* v. *Azar*, 435 Mass. 675, 688 (2002), quoting *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 397 (1998), *S.C.*, 431 Mass. 360 (2000). *Commonwealth* v. *Serino*, 436 Mass. 408, 417 (2002), and cases cited (malice shown where injuries indicate intent to cause death). Moreover, where a murder case is defended on the issue of identity, flaws in a malice instruction are less significant. See *Commonwealth* v. *Festa*, 388 Mass. 513, 515 (1983) (use of word "presumption" in malice instruction).

j. *Duplicative sentences.* The defendant argues that because the jury may have reached their verdict on the theory of felony-murder the defendant's convictions for the underlying felony of armed robbery must be dismissed as duplicative. The jury were not charged on felony-murder in the second degree and the evidence did not warrant it. The defendant was not accused of a felony that was punishable by less than life in prison. See *Commonwealth* v. *White*, 353 Mass. 409, 424 (1967), cert. denied, 391 U.S. 968 (1968) (murder in second degree appropriate where killing occurred during commission of crime of breaking and entering). There was no error.

k. *Weight of the evidence.* We reject the defendant's argument that this court should exercise its power under G. L. c. 278, § 33E, to order a new trial because the weight of the evidence did not support his convictions. At the very least, the jury were entitled to believe Renz's testimony.

l. *Cumulative errors.* We likewise reject the defendant's argument that cumulative errors were such that he was denied due process. There was no substantial likelihood of a miscarriage of justice because our review of the record reveals that none of the errors either alone or in combination with others, warrants a new trial.

2. *Denial of motion for a new trial.*

The defendant appealed the denial of his motion for a new trial. The defendant argues that, given the specific allegations in his motion for a new trial, this court should remand the case for an evidentiary hearing. We have examined the issues in the motion for a new trial that were not covered in his direct appeal. Because the judge addressed the issues on the substantive merits in his denial of the defendant's motion for a new trial, we considered them as if they had been properly preserved at trial. Having done so, however, we either find no error or find that the defendant was not harmed by the error. Accordingly, we affirm the denial of the defendant's motion for a new trial, including the request for an evidentiary hearing, and the denial of his motion for reconsideration thereof.

3. *G. L. c. 278, § 33E.*

We have reviewed the entire record and see no reason to exercise our power to order either a new trial or to grant any other relief the defendant requested.

4. *Conclusion.*

The judgments of conviction are affirmed. The orders denying the motion for a new trial and the other posttrial motions are affirmed.

*So ordered.*